**MacLEAN ASSOCIATES, INC.**

v.

**WM. M. MERCER–MEIDINGER–HANSEN, INC.**

v.

**Barry MacLEAN and Greg Darnley**

**Barry MacLean, Appellant.**

No. 91–1132.

United States Court of Appeals, Third Circuit.

Argued July 9, 1991.

Decided Dec. 31, 1991.

Frank J. Benasutti (argued), Benasutti, P.C., Wynnewood, Pa., for appellant.

Robert Neuner (argued), Robert C. Scheinfeld, Carl Oppedahl, Brumbaugh, Graves,

Donohue & Raymond, New York City, and Roger W. Herrell, Dann, Dorfman, Herrell & Skillman, Philadelphia, Pa., for appellee.

Before STAPLETON, HUTCHINSON and ROSENN, Circuit Judges.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

## I.

Barry MacLean (Mr. MacLean) appeals a ruling of the United States District Court for the Eastern District of Pennsylvania granting appellee, Wm. M. Mercer–Meidinger–Hansen, Inc.'s (Mercer's), motion for a directed verdict on Mr. MacLean's copyright claims against Mercer. Mr. MacLean is a former employee of Mercer, an employee benefit and compensation consulting firm. In addition to consulting, Mercer provides computer software for job evaluation to businesses. Mr. MacLean left Mercer to form a competing consulting firm, MacLean Associates, Inc. (MacLean Associates). Mr. MacLean asserts that he had a valid, enforceable copyright as creator of the Job Evaluation and Management System (JEMSystem) which Mercer infringed by incorporating it into software for a competing system, known as CompMaster, that Mercer devised.

For the reasons hereinafter set forth, we will vacate the judgment in favor of Mercer on Mr. MacLean's claim that Mercer's incorporation of the JEMSystem software into CompMaster infringed a copyright in JEMSystem belonging to Mr. MacLean as JEMsystem's creator and remand the case to the district court for further proceedings consistent with this opinion.

## II.

On December 1, 1989, MacLean Associates filed a declaratory judgment action in the United States District Court for the Eastern District of Pennsylvania. It filed the action after notification from Mercer of its contention that MacLean Associates was infringing Mercer's copyright in CompMaster. MacLean Associates sought a judgment against Mercer declaring that MacLean Associates' computer software known as CARS written in the Clipper programming language (Clipper CARS) did not infringe Mercer's registered copyrights in CompMaster and that MacLean Associates did not compete unfairly with Mercer by misappropriating its trade secrets. Mercer filed an answer on January 4, 1990 and counterclaimed against MacLean Associates. Mercer then joined Mr. MacLean and Greg Darnley (Darnley), a former employee of Mercer hired by MacLean Associates, and filed third-party complaints against them.

MacLean Associates and Mr. MacLean filed an amended complaint and counterclaim on September 17, 1990. The amended complaint sought a judgment against Mercer declaring that neither MacLean Associates, Mr. MacLean nor Darnley had infringed Mercer's copyright or engaged in unfair competition. Mr. MacLean asserted two counterclaims against Mercer in his individual capacity. The first claim alleged that Mercer infringed his copyright in a computer spreadsheet program called JEMSystem by incorporating JEMSystem into a system called JES and later into CompMaster. The second claim alleged that Mercer falsely described its CompMaster program by failing to credit Mr. MacLean as an author of a portion of it in violation of section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West Supp.1991).

Mercer then filed an amended answer, counterclaims, affirmative defenses and reply to the amended pleading of MacLean Associates and Mr. MacLean. Mercer denied any liability to Mr. MacLean and asserted by way of affirmative defense that JEMSystem was owned by Mercer as a work made for hire or license and that Mr. MacLean's claims were barred by laches. Mercer counterclaimed against Mr. MacLean for a judgment declaring that it did not infringe Mr. MacLean's alleged copyright in JEMSystem and did not violate section 43(a) of the Lanham Act. Mercer also sought an order requiring Mr. MacLean to assign his copyright registration in JEMSystem to it, claiming it was either the owner or co-owner of the JEMSystem pro-

gram. In its amended counterclaims and third-party claims against MacLean Associates, Mr. MacLean and Darnley, Mercer asserted claims concerning the alleged copying of CompMaster into Clipper CARS. These claims included copyright infringement and common law causes of action under Pennsylvania law for misappropriation and misuse of trade secrets, unfair competition, unjust enrichment and misappropriation of business information. Mercer further asserted third-party claims solely against Darnley for breach of fiduciary duty and for contribution to or indemnification from any judgment which might be rendered against Mercer and in favor of Mr. MacLean.

All these competing claims eventually came to trial before a jury. After Mr. MacLean and MacLean Associates rested their case-in-chief, the district court directed a verdict against Mr. MacLean on his claims for infringement of his copyright in JEMSystem and false designation of origin. It held that Mercer was the owner and author of all copyrights in JEMSystem. Specifically, the district court ruled that Mr. MacLean was an employee of Mercer at the time he created JEMSystem and thus Mercer was the owner of all copyrights in JEMSystem because it was a work made for hire. Alternately, the district court ruled that Mr. MacLean gave Mercer an implied license in the JEMSystem program. As a third alternate ground for granting Mercer's motion for a directed verdict, the court held that Mr. MacLean furnished JEMSystem to Mercer when he had full knowledge that Mercer would copy and exploit it and that thus his JEMSystem claims against Mercer were barred under the doctrine of laches.[1]

The rest of the case then proceeded before the jury. At the close of its evidence, Mercer voluntarily dismissed all of its claims against Mr. MacLean and Darnley. Mercer's claims against MacLean Associates for copyright infringement and misappropriation of trade secrets in connection with MacLean Associates' Clipper CARS software were submitted to the jury on special interrogatories. The jury found that MacLean Associates infringed Mercer's copyright in CompMaster and misappropriated Mercer trade secrets. The jury awarded Mercer an aggregate amount of $1,958,021.00 in compensatory and punitive damages.

In a judgment and injunction order dated January 9, 1991, the district court entered judgment on the verdict against MacLean Associates and enjoined it from continued infringement of Mercer's rights in CompMaster or continued unfair competition with it.[2] Mr. MacLean and MacLean Associates moved for judgment notwithstanding the verdict, or alternately, a new trial. Additionally, MacLean Associates moved for a stay of proceedings to enforce the judgment pursuant to Federal Rule of Civil Procedure 62(b). The district court denied both of these motions in an order entered January 18, 1991. On February 15, 1991, Mr. MacLean, on his own behalf, filed a notice of appeal from the district court's order of January 18, 1991. Mr. MacLean then filed a second notice of appeal on February 19, 1991 from the district court's

1. The direction of that verdict in favor of Mercer necessarily disposed of certain of Mercer's counterclaims against Mr. MacLean. In them, Mercer had sought a declaratory judgment that the incorporation of JEMSystem into its CompMaster program did not infringe any copyright owned by Mr. MacLean and an order requiring Mr. MacLean to assign his copyright in JEMSystem to it.

2. The order held that all versions of Clipper CARS up until December 5, 1990 infringed Mercer's copyrights, enjoined MacLean Associates from "copying, using, licensing, selling, distributing or otherwise marketing Clipper CARS or any other software that is derived, directly or indirectly, from the CompMaster source code or data base structures," and ordered it to recall all copies of Clipper CARS from its customers and licensees. The order further directed that a bench trial be held on January 29, 1991 to determine whether the data base structures of Maclean Associates' post-December 5, 1990 version of Clipper CARS were substantially similar to the data base structures of CompMaster and whether the injunction should be made applicable thereto. By order dated January 31, 1991, the court extended the injunction to some, but not all, of these data base structures.

judgment and injunction order.[3] Both appeals were timely.

## III.

Mr. MacLean began work at Mercer in 1980.[4] Mr. MacLean became a highly paid, high level employee of the company with the title of "principal." As a principal, he received stock as partial compensation and participated in a special compensation program. Among Mr. MacLean's responsibilities at Mercer were the creation and execution of marketing plans in the field of compensation consulting. The New York Stock Exchange (NYSE) was one of Mercer's clients for whom Mr. MacLean was responsible. In 1984 and 1985, Mr. MacLean directed a study for the NYSE in which he sought to design a job evaluation system and administrative procedures to accompany the system. A preliminary report of the study was delivered to the NYSE on September 19, 1985.

On September 30, 1985, MacLean left the formal employ of Mercer to open his own employment consulting business in New Hope, Pennsylvania under the name "MacLean Associates, Inc." Following his formal exit from Mercer, Mr. MacLean continued to provide services to the NYSE. Mr. MacLean did not inform the NYSE that he was no longer employed with Mercer. Instead, Mr. MacLean continued to administer the NYSE project on Mercer's behalf precisely as before, but now as a paid consultant. Mr. MacLean did not seek to take the NYSE account to his newly formed company since the NYSE was already under contract with Mercer and he did not think the NYSE would choose to do business directly with his new company.

While working as a paid consultant for Mercer on its job with the NYSE, Mr. MacLean's responsibilities remained the same as they were before he left Mercer. From October 1985 to June 1986, Mercer authorized Mr. MacLean to communicate with the NYSE on Mercer stationery as a Mercer principal. Mr. MacLean billed Mercer for his services and Mercer paid these bills without any specific reimbursement from the NYSE. The evidence introduced at trial also showed that Mr. MacLean had authority after he left the formal employ of Mercer to bind Mercer in its contractual relationship with the NYSE. For example, in November of 1985 Mr. MacLean absolved the NYSE of a $90,000.00 debt the NYSE owed to Mercer on the software project.

Central to the dispute in this case is the development, by both Mercer and Mr. MacLean, of computer software used to evaluate job performance. Beginning sometime in January 1986, Mr. MacLean authored a computer spreadsheet program called JEMSystem. It is a job evaluation and administration program that uses a scored questionnaire methodology. The JEMSystem software allows a business to compare different jobs in their organization, value them and determine compensation for them on its own personal computers without using a consultant. The program was written for the NYSE using the computer language Lotus 1–2–3. Mr. MacLean says that although Mercer employees provided computer-related support during this time, he designed and developed the JEMSystem software on his own using his equipment in

---

**3.** We assume that Mr. MacLean appeals only that aspect of the district court's judgment and injunction order of January 9, 1991 which held that Mercer is the owner and author of all copyrights in JEMSystem. MacLean Associates has not appealed the judgment for $1,958,021.00 entered on the jury's verdict or the injunction against it. In response to a question from the Court at oral argument, Mr. MacLean's counsel stated that MacLean Associates did not appeal the jury's verdict against it on Mercer's claim that MacLean Associates infringed upon Mercer's copyright in CompMaster by copying part of it into Clipper CARS because it involved issues separate from those relating to Mr. Mac-

Lean's claim that Mercer had infringed the copyright that Mr. MacLean claims he held as the creator of JEMSystem. Thus, we consider only Mr. MacLean's arguments that the district court committed reversible error in directing a verdict in Mercer's favor on his JEMSystem copyright claims.

**4.** Mr. MacLean was hired as a regional vice-president of Meidinger in 1980. Mercer later acquired Meidinger and the combined companies are now known as William M. Mercer-Meidinger–Hansen, Inc.

New Hope. Mr. MacLean delivered the JEMSystem program to the NYSE on March 13, 1986. He used Mercer stationery and referred to the program as the one "we've written to administer JEMS[ystem]." Defendant's Exhibit No. 564.

Mr. MacLean knew as early as August of 1985 that Mercer was considering the development of a personal computer-based job evaluation system. At two times during 1986, Mr. MacLean supplied disks of the JEMSystem software to Mercer employees Darnley and Linda Ison to combine the NYSE databases and export the data out of Mercer's mainframe into the JEMSystem software. He did not place any restrictions on the use of the disks or advise Mercer that he believed he had rights in the JEMSystem software at that time. Darnley testified that, at the direction of his superiors, he copied features of JEMSystem into a Mercer system in the process of development called Job Evaluation System (JES) and later incorporated JEMSystem into Mercer's CompMaster program.

By 1987, Mr. MacLean knew Mercer was marketing JES. Mercer says that one of MacLean Associates' employees had a copy of Mercer's JES program that was allegedly similar to MacLean's JEMSystem software as early as January of 1987, and so Mr. MacLean had the ability to determine then that he had a claim against Mercer for infringement. In June 1989, a client provided MacLean Associates with disks to audit and update the client's job evaluation system. The disks the client provided were CompMaster software. Mr. MacLean did not give Mercer notice that he intended to sue it for copyright infringement until July of 1990. On July 27, 1990, the United States Copyright Office issued Mr. MacLean a copyright registration certificate for JEMSystem. The district court, nevertheless, held that Mercer, and not Mr. MacLean, was the owner and author of JEMSystem.

After developing JEMSystem for the NYSE using the Lotus language, Mr. MacLean hired a programmer to write JEMSystem in a language called Clarion. The result was Clarion CARS, a larger, more sophisticated system which incorporated JEMSystem. Mercer's job evaluation program CompMaster used a computer language called Clipper. When Mr. MacLean left Mercer, he began to solicit other Mercer employees to join his new company. Among the Mercer employees he solicited was Darnley, a key employee in the development of CompMaster at Mercer. Darnley left Mercer in May of 1988 to join MacLean Associates. He took with him the CompMaster source code and instruction manual. Once Darnley joined MacLean Associates, MacLean Associates stopped working on the Clarion CARS program and began work with the Clipper language. MacLean Associates eventually produced a program called Clipper CARS which incorporated JEMSystem. Clipper CARS contains some program lines identical to those in CompMaster. Based on these facts, the jury returned its verdict in Mercer's favor on Mercer's claims that MacLean Associates had infringed its copyright and misappropriated its trade secrets by copying CompMaster into Clipper CARS.

## IV.

We have appellate jurisdiction over the district court's final order in this matter pursuant to 28 U.S.C.A. § 1291 (West Supp.1991). The district court had subject matter jurisdiction pursuant to 28 U.S.C.A. § 1331 (West Supp.1991) because the complaint alleged causes of action arising under federal law.

We exercise plenary review over the district court's grant of Mercer's motion for a directed verdict on Mr. MacLean's claims against Mercer for infringement and unfair competition concerning his ownership of JEMSystem. *See Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir.1987). As we stated in *Macleary*:

A motion for a directed verdict under Fed.R.Civ.P. 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one

directed would be erroneous under the governing law.

*Id.*

## V.

The district court gave several alternate justifications for its grant of a directed verdict in favor of Mercer on the issue of whether Mr. MacLean had a valid, enforceable copyright in the JEMSystem software. First, the district court held that Mr. MacLean created JEMSystem as a work for hire on Mercer's behalf. Under the work made for hire doctrine, a copyright belongs to the party who employs the work's creator while it is being created. *See* 17 U.S.C.A. § 101 (West 1977). Second, the district court held that the relationship between Mr. MacLean and Mercer created an implied license in Mercer to use the software. Last, the district court held that Mr. MacLean's claim for copyright infringement against Mercer was barred under the doctrine of laches since he failed to assert any right he might have in the JEMSystem software in a timely fashion. Each of these alternate bases for the district court's ruling is considered below. Mr. MacLean says none of the bases the district court gave for its verdict against him can survive appellate scrutiny, and accordingly, he asks us to remand for a new trial on his claims against Mercer or to direct a verdict in his favor on these claims.

## A.

■ We consider first the argument that Mr. MacLean created JEMSystem as a work for hire. If so, the copyright belongs to Mercer, the party that hired Mr. MacLean, the creator of the work. The work made for hire doctrine is codified at 17 U.S.C.A. § 201(b) (West 1977). That statute states:

Works Made for Hire.—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

*Id.* The statutory definition of a work made for hire is found at 17 U.S.C.A. § 101. That section provides:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. . . .

*Id.*

We must therefore consider whether Mr. MacLean was a Mercer employee within the meaning of 17 U.S.C.A. § 101(1) when he wrote the JEMSystem software.[5] In *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court examined the work made for hire doctrine and set out a test for determining when a person is acting as an employee within the meaning of 17 U.S.C.A. § 101(1). There, the Community for Creative Non–Violence (CCNV) contacted Reid, a sculptor, and asked him to produce a sculpture displaying two adult figures and an infant as contemporary homeless people huddled around a steam grate in Washington, D.C. Reid orally agreed to produce the sculpture. During the time the sculpture was being created, Reid gave sketches of it to the CCNV and received assistance from various CCNV members.

Following completion of the sculpture, Reid delivered it to the CCNV for installation at a site where it was to be displayed for one month. After its month-long exhi-

---

**5.** JEMSystem, a piece of computer software, does not fall within any of the nine categories of "specially ordered or commissioned" works enumerated in 17 U.S.C.A. § 101(2), nor was there any written agreement between the parties that JEMSystem was such a work.

bition, the CCNV returned the sculpture to Reid for minor repairs. While the sculpture was back in Reid's possession, CCNV announced plans to take the sculpture on an ambitious tour of several cities to raise money for the homeless. Reid objected, claiming that the sculpture was not strong enough to survive the trip. Nevertheless, CCNV stuck to its plans and refused to have the sculpture bronzed or duplicated. Shortly thereafter, CCNV asked Reid to return the sculpture and he refused. Reid instead applied for a copyright upon the sculpture and announced his own plans to take the sculpture on a less ambitious tour. CCNV then filed a competing certificate of copyright registration. CCNV also filed suit seeking return of the sculpture and a determination of copyright ownership.

The district court held that the sculpture belonged to CCNV because Reid was an employee of CCNV within the meaning of 17 U.S.C.A. § 101(1) when he produced the sculpture, and thus the sculpture was a work made for hire. The United States Court of Appeals for the District of Columbia Circuit reversed, holding that the sculpture was not a work made for hire. The Supreme Court granted *certiorari* and affirmed the Court of Appeals' judgment.

The Supreme Court began its analysis as follows:

> The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102. The Act carves out an important exception, however, for "works made for hire." If the work is for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary. § 201(b).

*Reid*, 490 U.S. at 737, 109 S.Ct. at 2171 (footnote omitted).

Here, as in *Reid*, the dispositive inquiry is whether JEMSystem was a work pre-

pared by an employee within the scope of his employment under 17 U.S.C.A. § 101(1). In *Reid*, the Supreme Court held that the statutory terms "employee" and "scope of employment" as found in 17 U.S.C.A. § 101(1) should "be understood in light of the general common law of agency." *Id.* at 740–41, 109 S.Ct. at 2173. Thus, a key inquiry is whether the producer of a work is an employee or an independent contractor. The Supreme Court wrote that central to resolution of this inquiry is "the hiring party's right to control the manner and means by which the product is accomplished." *Id.* at 751, 109 S.Ct. at 2178. The Supreme Court set forth a number of factors pertinent to whether the creator of a work is an employee:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52, 109 S.Ct. at 2178–79 (footnotes omitted).

In *Reid*, the Supreme Court explained the application of these factors in light of that case's particular circumstances:

> Examining the circumstances of this case in light of these factors, we agree with the Court of Appeals that Reid was not an employee of CCNV but an independent contractor. True, CCNV members directed enough of Reid's work to ensure that he produced a sculpture that met their specifications. But the extent of control the hiring party exercises over the details of the product is not dispositive. Indeed, all the other circumstances weigh heavily against finding an employment relationship. Reid is a sculptor, a skilled occupation. Reid supplied his

own tools. He worked in his own studio in Baltimore, making daily supervision of his activities from Washington practicably impossible. Reid was retained for less than two months, a relatively short time. During and after this time, CCNV had no right to assign additional projects to Reid. Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when and how long to work. CCNV paid Reid $15,000, a sum dependent on "completion of a specific job, a method by which independent contractors are often compensated." Reid had total discretion in hiring and paying assistants. "Creating sculptures was hardly 'regular business' for CCNV." Indeed, CCNV is not a business at all. Finally, CCNV did not pay payroll or social security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds.

*Id.* at 752–53, 109 S.Ct. at 2179 (citations and quotations omitted). For these reasons, the Supreme Court affirmed the Court of Appeals' holding that Reid was an independent contractor. As a result, it also affirmed the Court of Appeals' holding that CCNV was not the sole author of the sculpture.

Mercer presents two arguments for upholding the district court's ruling that Mr. MacLean wrote the JEMSystem software in his capacity as a Mercer employee. It argues that an actual and apparent master-servant relationship existed between Mr. MacLean and Mercer.

We believe that consideration of the nine factors the Supreme Court listed in *Reid* could bring a rational jury to conclude that Mr. MacLean was not an actual servant of Mercer when JEMSystem was created. Mr. MacLean says he wrote the JEMSystem software after he left Mercer and continued in a consulting relationship with it

on the NYSE project. His task of writing sophisticated computer software required skill and creativity.[6] Mr. MacLean worked with his own software on his own computer at his own facility to complete Mercer's obligation under its contract with NYSE. Although Mr. MacLean was a principal of Mercer for almost five years, the duration of his relationship as a consultant for Mercer on the NYSE project was fairly short. Mercer did not have the right to assign additional projects to Mr. MacLean. Mr. MacLean had absolute discretion over when and how long to work.[7] Mercer paid Mr. MacLean for the delivery of his services as a consultant, instead of paying him a regular periodic salary. It is obvious that Mercer's regular business is compensation consulting. It was not a part of Mercer's regular business at the relevant time to provide software for its clients' use on personal computers; instead, prior to Mr. MacLean's creation of the JEMSystem software, Mercer took raw data its clients provided and produced for its clients computerized reports that evaluated and synthesized the data. Mercer did not pay any payroll or social security taxes on behalf of Mr. MacLean after he ceased to be one of Mercer's principals, nor did it thereafter provide him with workers' compensation coverage or contribute to unemployment insurance or workers' compensation funds. It is not known how Mercer treated its payments to Mr. MacLean for its own corporate tax purposes.

Nor does the district court's determination that Mr. MacLean was an apparent agent of Mercer at the time he wrote JEMSystem survive scrutiny. There is no doubt that Mr. MacLean, with Mercer's permission, held himself out to the NYSE as a Mercer employee even after he left the company. Under the Supreme Court's decision in *Reid* and the language of the Copyright Act, however, the central focus

---

6. In this respect, we note this Court's holding in *Whelan Assocs. v. Jaslow Dental Lab.,* 797 F.2d 1222, 1248 (3d Cir.1986) that copyright protection of computer programs may extend beyond the programs' literal code to their structure, sequence and organization.

7. Indeed, a letter from Mr. Lloyd Kaye of Mercer to Mr. MacLean regarding the NYSE project states: "It should come as no surprise to you that I have a twilight zone feeling about this: You working, sending us bills, we have no knowledge of what's going on." Appendix for Appellant (App.) at 486.

of the work for hire doctrine is upon the relationship between the person performing the work and the person paying him to perform the work. Here, Mr. MacLean performed the work, and Mercer paid him to perform the work. The fact that the NYSE thought that Mr. MacLean was an employee of Mercer at the relevant time is of no moment. Mercer, the party who seeks to invoke the work for hire doctrine, was aware of the true nature of its relationship with Mr. MacLean at all times. Mercer is not a third party who was fooled in any way by Mr. MacLean's representations to the NYSE.

■ In short, even though Mr. MacLean may have been Mercer's apparent agent at the time he developed the JEMSystem software, apparent agency is not dispositive of the question of whether Mr. MacLean was an employee of Mercer or an independent contractor. Restatement (Second) of Agency § 2(3) (1958) states:

> An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

To the extent that the district court focussed upon the fact that Mr. MacLean appeared to be a Mercer employee in his dealings with the NYSE, its decision granting Mercer a directed verdict cannot stand. In this case, the focus should have been solely upon the nature of the relationship between Mr. MacLean and Mercer. Accordingly, the district court erred in holding that Mr. MacLean wrote his software as a work made for hire on behalf of Mercer based upon the NYSE's belief that Mr. MacLean was employed by Mercer. Both Mercer and Mr. MacLean knew the status of their relationship; any apparent employment relationship perceived by third parties is immaterial.

A consideration of the nine factors that the Supreme Court in *Reid* held control the application of the work for hire doctrine points clearly to the conclusion that a ra-

tional jury could have found Mr. MacLean was not an actual employee of Mercer at the time he wrote JEMSystem, but an independent contractor. Thus, unless one of the district court's alternate holdings survives, the district court's grant of a directed verdict against Mr. MacLean cannot stand. Therefore, we turn to the district court's two alternate holdings in support of its grant of a directed verdict in favor of Mercer.

### B.

The second basis for the district court's grant of a directed verdict in favor of Mercer was its holding that Mr. MacLean gave Mercer an implied license in the JEMSystem software. The district court held Mercer had an exclusive implied license in the software. Mercer, in its brief, admits that it cannot have an exclusive implied license; however, it asks us to uphold the district court's grant of a directed verdict on the basis that Mr. MacLean gave it a nonexclusive implied license.

■ Under the Copyright Act, the owner of a copyright has the exclusive right to copy, distribute or display his work. *See* 17 U.S.C.A. § 106 (West 1977 & Supp. 1991). The owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it. *See id.* § 101. Exclusive licenses must, however, be in writing. *See id.* § 204(a) (West 1977); *Effects Assocs. v. Cohen*, 908 F.2d 555, 556 (9th Cir.1990), *cert. denied*, ─── U.S. ───, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Here, the parties agree that Mr. MacLean never gave Mercer any writing that could have transferred ownership of JEMSystem from Mr. MacLean to Mercer through exclusive license.

■ While 17 U.S.C.A. § 204 provides that all transfers of copyright ownership, including transfers by exclusive license, must be in writing, a nonexclusive license is expressly removed from the scope of section 204 because a nonexclusive license does not amount to a "transfer" of ownership. *See* 17 U.S.C.A. § 101. The leading treatise on copyright law, 3 M. Nimmer &

D. Nimmer, *Nimmer on Copyright* § 10.-03[A], at 10–37 (1991), states that "[a] nonexclusive license may be granted orally, or may even be implied from conduct." In *Effects Assocs.*, the court wrote that a nonexclusive license may arise by implication where the creator of a work at a defendant's request "hand[s] it over, intending that defendant copy and distribute it." 908 F.2d at 558. The fact that Mr. MacLean delivered a copy of his software to two Mercer employees "does not of itself convey any rights in the copyrighted work embodied in the object." 17 U.S.C.A. § 202 (West 1977). Delivery of a copy of the creation "is one factor that may be relied upon in determining that an implied license has been granted." *Effects Assocs.*, 908 F.2d at 559 n. 6. Since a nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee, the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license. *Id.* at 558 n. 5.

■ In holding that Mercer had an implied license to use the JEMSystem program, the district court relied on the fact that "Mr. MacLean put in writing to Mercer that you, Mercer, have developed out of the relationship with the [NYSE] a computer software that I've developed...." App. at 465. Counsel for Mr. MacLean appears to have agreed with the district court that Mercer had an implied license to use JEMSystem in connection with the NYSE project. He stated: "[Mercer] paid the amount of money for that software and for that project, which was an ongoing project for a number of years. They're entitled to keep going on that thing. There's no doubt about it. Copyright[, however,] relates to whether or not the ownership can be transferred to other jobs and projects." App. at 476. The undisputed facts indicate that Mercer had a nonexclusive implied license to use JEMSystem in furtherance of its business relationship with its client, the NYSE.

If Mercer is correct that the district court meant to hold that Mr. MacLean gave Mercer a nonexclusive license in the software, we could uphold the district court's grant of a directed verdict in Mercer's favor only if the record shows that no rational jury could find Mercer exploited the JEMSystem software beyond the scope of any nonexclusive license Mr. MacLean had given it. Any nonexclusive implied license that Mr. MacLean gave Mercer in JEMSystem was, however, limited. Both Mr. MacLean and Mercer knew that Mr. MacLean was developing JEMSystem solely for the NYSE account. Never did Mr. MacLean give Mercer any indication that Mercer could exploit JEMSystem to the extent that it allegedly did by copying parts of it wholesale into computer programs it would later market generally as a business consultant in competition with Mr. MacLean's own consulting firm. The record does not anywhere indicate that Mr. MacLean gave Mercer the type of broad, nonexclusive license that Mercer would have needed to protect, against Mr. MacLean's copyright infringement claims, its act of incorporating JEMSystem into its CompMaster program. Accordingly, we also hold that the district court's directed verdict for Mercer and against Mr. MacLean on his claim of copyright infringement cannot be sustained on a theory of implied license.

### C.

■ The district court's third and final alternate ground for granting Mercer a directed verdict on Mr. MacLean's claims was the equitable doctrine of laches. The district court noted that Mr. MacLean transferred a disk containing his software to Mercer twice in early 1986 with no restrictions placed on its use. It stated that "in the relationship between Mr. MacLean and Mercer, Mr. MacLean reasonably anticipated that what was being used in a joint project for the [NYSE] would be copied." App. at 466. Mr. MacLean did not bring suit for copyright infringement until September 1990 when he and MacLean Associates filed an amended complaint in this action. The district court held that this was an undue delay that was not excusable because Mr. MacLean knew Mercer was copying JEMSystem software and yet failed promptly to inform Mercer that he

claimed a copyright in the JEMSystem program.

This Court examined the equitable defense of laches in *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69 (3d Cir.1986). We wrote:

> As discussed in Pomeroy's treatise, "A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time."

*Id.* at 75–76 (quoting J. Pomeroy, II *Equity Jurisprudence* § 419 at 171 (S. Symons 5th ed. 1941)). The defense of laches requires proof that the party bringing the suit engaged in unreasonable and inexcusable delay that prejudiced the defendant. *Id.* at 74.

We hold the district court erred in applying laches to bar Mr. MacLean's claim that Mercer infringed on any copyright he might own as the creator of the JEMSystem program. The evidence of laches Mercer advances is insufficient to bar Mr. MacLean's claims. We summarize the evidence directly from Mercer's brief:

> In August 1985, Mr. MacLean knew that Mercer was considering the development of another personal computer based job evaluation system. On two different occasions in 1986, Mr. MacLean supplied disks of the JEMSystem software to Mercer employees. No restrictions were placed on Mercer's use of the disks. At no time in the period 1985 or 1986 did Mr. MacLean advise Mercer of his belief that he had some rights in the JEMSystem software. Nor did Mr. MacLean give any indication to Mercer that Mr. MacLean thought that the JEMSystem software was his.
>
> In January, 1987, Mr. MacLean had in his possession a diskette containing the executable code for Mercer's allegedly infringing JES software. Mr. MacLean could have but did not run the program to determine whether the JES software constituted an infringement of his alleged rights in the JEMSystem software. In May, 1988, Mr. MacLean hired the Mercer programmer, Greg Darnley, who knew of Mercer's alleged infringement because he was the one who allegedly copied JEMSystem into Mercer's JES software.
>
> Through all this time Mr. MacLean remained silent. The first notice to Mercer of Mr. MacLean's alleged rights in the JEMSystem program and Mercer's alleged infringement of those rights occurred on July 30, 1990 when Mr. MacLean moved to amend the original Complaint in this action. It was simply too late.

Brief for Appellee at 25–26 (citations omitted).

There are several reasons why the facts that can be inferred from this evidence are insufficient to establish laches. First, the district court's laches rationale would have put Mr. MacLean under a never ending obligation to discover whether anyone to whom he ever supplied his software would copy it. The Copyright Act does not recognize such an obligation. Instead, to prove copyright infringement, Mr. MacLean need only establish that he owns a copyright in JEMSystem and Mercer copied it. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 290 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The undisputed evidence shows that January of 1989 was the earliest that Mr. MacLean had received a copy of the allegedly infringing Mercer program. At that time, a client had provided MacLean Associates with disks to audit its job evaluation system and the disks were CompMaster software.[8] Neither party disputes that this suit was timely with respect to the applicable statutes of limitations. The district court's directed verdict against Mr. MacLean, to the extent it was

---

**8.** We also reject Mercer's argument that the fact that possession in 1987 of a copy of Mercer's JES software by an employee of MacLean Associates, who continued to do consulting for Mercer, was sufficient to put Mr. MacLean on notice of copyright infringement.

justified on the bases of laches, cannot stand.[9]

Since none of the district court's alternate holdings can support the directed verdict for Mercer and against Mr. MacLean, we must vacate the district court's grant of a judgment in favor of Mercer on Mr. MacLean's infringement claims. We cannot, however, grant Mr. MacLean's request that we direct an entry of partial judgment in his favor. Since Mercer received its directed verdict at the close of Mr. MacLean's evidence, Mercer has not yet had an opportunity to put on its defense. Mercer must be given a chance to introduce evidence concerning exactly when JEMSystem was created, as well as evidence to demonstrate the scope of any implied nonexclusive license it may have in JEMSystem and any additional evidence it may have with respect to laches. If, on remand, a jury returns a verdict in favor of Mr. MacLean, he presumably will be entitled to equitable relief against Mercer's continuing use of CompMaster, to the extent CompMaster incorporates JEMSystem, as well as any damages he has suffered to date. The scope of that relief will, of course, be within the sound discretion of the district court.

## VI.

Accordingly, we will vacate the district court's entry of judgment in favor of Mercer on Mr. MacLean's claims against it for copyright infringement and false designation of origin and remand this matter to the district court for a new trial on these claims.

---

9. We note, however, that Mercer is not precluded from introducing in its defense other facts that might establish laches. The current posture of this case is that Mr. MacLean introduced his evidence and then the district court granted a directed verdict in favor of Mercer.